**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| SAKS GLOBAL ENTERPRISES LLC and THE NEIMAN MARCUS GROUP LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> YUMI SHIN, <br><br> *Defendant*. | Case No.: |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs Saks Global Enterprises LLC and The Neiman Marcus Group LLC ("NMG" or the "Neiman Marcus Group") (collectively, "Saks" or "Plaintiffs") bring this action against Defendant Yumi Shin ("Shin" or "Defendant"), the former Chief Merchandising Officer of Saks' wholly owned subsidiary, Bergdorf Goodman ("BG" or "Bergdorf"), an iconic luxury department store that is a division of NMG. Shin, a highly compensated and high-visibility executive within the most senior ranks of the BG organization, signed and reaffirmed a Restrictive Covenant Agreement (the "RCA") that prohibits her from working for a direct competitor of NMG for a period of one year following the termination of her employment. Despite holding a high-level executive role, being fully aware that she signed the RCA, and accepting extensive equity participation in exchange for signing and reaffirming the RCA, Shin recently resigned from her position as Chief Merchandising Officer of BG to assume a comparable position at one of Saks's chief competitors, Nordstrom, Inc. ("Nordstrom"). This, of course, is a direct violation of her contractual non-competition restrictions, and she is doing so in a role that would inevitably require her to use and disclose Saks' confidential and trade secret business information for the benefit of her new employer. Further, as additional evidence of her intent violate

her legal obligations to Saks, a forensic review and analysis of Shin's Saks-issued devices indicated that Shin downloaded large quantities of confidential information and trade secrets in the days immediately preceding her resignation from Saks, including sensitive information relating to the larger Saks organization that she had no legitimate business need to access. Shin also apparently re-set her Saks-issued devices before returning them to Saks, evidencing an apparent attempt to prevent Saks from discovering Shin's conduct prior to her resignation.

In her role at BG, Shin reported directly to BG's President, Tracy Margolies, and was privy to the business's most highly sensitive information relating to merchandising strategies, brand relationships, financial data, operational and inventory structures, strategic direction, enterprise-wide initiatives, sales performance, and customer data and marketing strategy. Shin also had responsibility for preparing and contributing to BG's proposals to obtain exclusive brand deals and partnerships and negotiating comprehensive business agreements with certain BG brand partners. If Shin were permitted to accept her position with Nordstrom, upon information and belief, she would be responsible for developing a merchandising strategy, managing relationships and negotiating contracts with existing brand partners, and obtaining exclusive brand deals and partnerships, all in direct competition with BG and the broader Saks enterprise.

Saks will be immediately and irreparably harmed if Shin is permitted to begin her new position with Nordstrom. Accordingly, Saks seeks preliminary and permanent injunctive relief to hold Shin to her contractual obligations and to prevent her from misusing Saks' trade secrets and confidential information. Saks also seeks damages based on Shin's conduct in violation of her legal obligations.

## **PARTIES**

1.      Saks is a limited liability company formed in the State of Delaware with headquarters and a principal place of business at 225 Liberty Street, 31st Floor, New York, New York 10281.

2.      NMG is a limited liability company registered in the State of Delaware with headquarters and a principal place of business at Cityplace Tower, Dallas, TX.

3.      Defendant Yumi Shin is an adult citizen and resident of New York. Shin was employed by NMG, for Bergdorf in New York, New York, until she voluntarily resigned on October 14, 2025, which was also her last day of employment with Bergdorf.

## JURISDICTION AND VENUE

4.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action includes claims arising under the laws of the United States, specifically, and the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831, *et seq*. The Court has supplemental jurisdiction over the breach of contract and other state law claims herein pursuant to 28 U.S.C. §1367 because the claims are so related to the DTSA claim for which this Court has original jurisdiction that they form part of the same controversy.

5.      The Court has personal jurisdiction over Defendant because, pursuant to Section 4 of the RCA executed by Defendant on January 7, 2022, and reaffirmed on January 4, 2024, through the Fiscal Year 2024 Equity Transfer Unit Award Agreement, Defendant agreed that all actions to enforce the RCA must be brought in state or federal courts in Dallas County, Texas. Accordingly, this Court has personal jurisdiction and venue based on the valid forum selection clause signed by Shin and NMG in the Restrictive Covenant Agreement.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as NMG is located in this judicial district.

## ALLEGATIONS COMMON TO ALL COUNTS
### *The Relationship Among Saks, The Neiman Marcus Group, and Bergdorf Goodman*

7.      Saks is the parent company of the Neiman Marcus Group. Saks acquired Bergdorf in December 2024 as part of Saks's acquisition of Neiman Marcus Group, which owned Bergdorf prior to the acquisition.

8.      Saks and its subsidiaries, including BG, are industry-leading multi-brand luxury retailers that present exclusive fashion, beauty, and lifestyle offerings from top luxury brands around the world through flagship department stores and their global e-commerce platforms.

9.      Bergdorf, in particular, is viewed as one of the most prestigious fashion retailers in the world, offering exclusive luxury clothing, beauty, accessories, and lifestyle products.

10.     BG carries considerable cachet, brand recognition and globally-recognized goodwill, stemming from its long-held position as a store synonymous with luxury retail.

11.     Its world-wide cultural influence is also apparent in its regular appearances in cultural publications and other media. For example, BG has appeared in films and television shows from the old Hollywood classic *How to Marry a Millionaire*, starring Lauren Bacall and Marilyn Monroe, to recent films and shows imbued in worlds of fashion and luxury, like *Sex and the City* and *Ocean's 8*.

12.     Not only does BG itself carry such prestige, but this prestige is imputed to its customers. For example, the 2004 New York Times bestselling novel *Bergdorf Blondes*, by Plum Sykes, positioned BG as synonymous with exclusivity, wealth, and high-society clientele.

13.     BG also occupies a rarified place in the fashion industry. As an example, the 2013 documentary *Scatter My Ashes at Bergdorf's* demonstrates BG's status not simply as a retailer, but as a cultural institution in global fashion due to its reputation for curatorial excellence and exclusivity. In the documentary, designers indicate that deals with BG are highly-sought after stamps of approval.

14.     Though BG has only one physical retail location (comprised of two stores, a men's store and a women's store) in New York City, its flagship department store customers from around the

globe and competes nationally and internationally for customers. Approximately 70% of the customers who patronize BG's store in New York come from elsewhere in the United States, with to BG from outside New York, with another 5% coming to the store from outside the United States. These customers opt for BG over other luxury retailers closer to home, demonstrating BG's worldwide appeal.

15.    Saks and NMG have physical retail locations throughout the country, in addition to on-line retail operations. BG also has on-line retail operations.

16.    BG has devoted substantial resources to the development of its relationships with brand partners, exclusive merchandise offerings, promotional arrangements, customer goodwill, and its strategic planning.

17.    BG's merchandising and marketing strategies, financial data, inventory ownership and operational strategies, customer data and analysis, and its relationships with brand partners have developed over many years at substantial cost, are all highly confidential and trade secrets.

18.    Disclosure of this information to Nordstrom would harm Saks and BG commercially, because a significant part of Saks' and BG's competitive advantage is its relationships with brand partners. If competitors like Nordstrom had access to this information, they could use it to their advantage in their own negotiations with brand partners.

### *As Chief Merchandising Officer, Shin Developed and Accessed Critical Strategic and Competitively Sensitive Information*

19.    Shin joined Saks affiliate Saks Fifth Avenue in January 2007. She began her career as a Vice President at Saks Fifth Avenue and advanced to become a Senior Vice President at Saks Fifth Avenue prior to Saks' acquisition of NMG and BG. Shin left Saks Fifth Avenue and became the Executive Buying Director at Bergdorf in October 2018. She was promoted to the position of Chief Merchandising Officer ("CMO") of BG in January 2019, a high-level, senior executive position within our organization that she held until her resignation on October 14, 2025.

20.     As CMO, Shin had substantial responsibilities, including, but not limited to: developing and maintaining relationships with new and established luxury brands; creating business growth strategies for BG and its brand partners; participating in long-term strategic growth initiatives for BG and Saks; monitoring and evaluating brand productivity and opportunities for growth; spearheading and managing teams of buyers at market for each upcoming season; developing merchandising strategies across BG; and negotiating and managing business relationships with brand partners, including financial terms, inventory ownership, and exclusivity provisions; and curating assets and product assortments around Bergdorf's retail and customer profile.

21.     As such a high-level employee, Shin also had access to BG's and Saks' most sensitive and confidential business information, including trade secrets, proprietary business strategies, financial data, and confidential relationships with customers, suppliers, and brand partners. This includes, but is not limited to:

(a)    Detailed information on Bergdorf, NMG, and Saks' finances, including early financial reports for all Saks' business units, quarterly reports, promotional strategies, and profit margins for Saks;

(b)    Terms of our contracts with brand partners, including exclusivity and inventory ownership models, and the negotiation tactics utilized to complete these deals;

(c)    Detailed information about upcoming product launches, including merchandising plans and buying strategies for the upcoming season;

(d)    Customer data, analysis and strategy including detailed information regarding the retail positioning and profiles of Bergdorf, Saks, and NMG, and related merchandising strategy and creative direction;

(e)    Detailed financial information for all Saks brand partners, including detailed information related to financial performance and for, at least, a five-year span; and

(f)    Saks' strategic growth plans, including target markets, and new brand partnerships.

22.     For example, Shin has detailed knowledge of the terms of agreements with Saks' brand partners, including promotional arrangements, inventory ownership models, exclusivity provisions,

and marketing allowances. She also was privy to Saks' negotiating strategies and tactics. Shin specifically has a deep and detailed knowledge of the financial metrics and performance data for Bergdorf's brand partners, which underlie many of the negotiations between Bergdorf and the various brands with which it does business.

23.    BG's brand relationships are particularly valuable. BG has cultivated these brand relationships over many years, and these relationships have resulted in exclusive merchandise offerings, and priority access to limited inventory that is critical to its business success.

24.    are a critical driver of its customer goodwill and public reputation. As CMO, one of Shin's most essential functions was to develop, nurture, and maintain relationships with the most exclusive brands and fashion houses. Shin's relationships with these brand partners, developed over the course of her employment with Bergdorf, using Bergdorf's channels and resources, and at Bergdorf's expense, would provide an immeasurable benefit to Nordstrom.

25.    This information would be incalculably valuable to competitors in the luxury goods retail space, including Nordstrom, Shin's prospective future employer. It is difficult to imagine how Shin could avoid using or relying upon this information if she began working for Nordstrom, including in helping Nordstrom to negotiate competitive terms with the same brands, taking into account the relative sales and profitability for each, none of which is public knowledge or known outside the top executive ranks at Saks.

26.    Likewise, Shin's knowledge of the concessions paid by certain brands to Bergdorf and, by virtue of her access to the company's broader data, Saks, could enable Nordstrom to negotiate more favorable deals with brand partners. This could result in the erosion of exclusive and/or preferential arrangements between Saks and certain brand partners, as well as a reduction in volume or selection of brand products.

27.    In addition to Shin's business operations activity, Shin was the public face of BG's merchandising strategy, attending high-profile, global industry events including New York, Paris, and Milan Fashion Weeks; in private meetings with brands and fashion houses across the globe; and, even, in media coverage positioning Shin as one of BG's key tastemakers.

28.    For example, Shin was the subject of a September 9, 2025 feature in the publication *Vogue* that discussed Shin's fashion choices and her role as CMO of BG. Talia Abbas, *9-5: How BG's Yumi Shin Brings Her Creative Spirit to the C-Suite*, Vogue (Sept. 9, 2025), https://www.vogue.com/article/yumi-shin-bergdorf-goodman-9-5. In fact, *Vogue* produces a seasonal feature entitled "Yumi Shin's Wish List", highlighting items selected by Shin for the upcoming season. *See, e.g.* "Yumi Shin's Wish List," Vogue (last viewed Nov. 25, 2025) https://www.vogue.com/yumi-shin-wish-list

29.    Further illustrating the public-facing nature of her role, multiple trade publications covered Shin's departure from BG. *See, e.g.* David Moin, *Yumi Shin Exits BG*, Women's Wear Daily (Oct. 15, 2025), https://www.wwd.com/business-news/retail/top-bergdorf-goodman-merchant-yumi-shin-exits-the-store-1238303758/; Lauren Sherman, *Guiducci's VF Debut & Yumi Shin's Next Move*, Puck (Oct. 15, 2025), https://puck.news/mark-guiduccis-vanity-fair-debut-yumi-shins-next-move.

30.    By leveraging BG resources and name recognition built over decades through significant financial investment and strategic planning, Shin has developed a BG-supported reputation, brand relationships, and customer goodwill. Her role sits at a unique nexus of creative tastemaking and business operations. Allowing Shin to immediately begin employment with one of BG's chief competitors will necessarily result in Shin utilizing resources, knowledge, relationships, and goodwill developed at BG for the advantage of its competitor, Nordstrom.

### *Shin Received Lucrative Stock Grants in*
### *Exchange for Entering Restrictive Covenants*

31.    CMO is a high-level position, and Saks compensated Shin accordingly. In her final year of employment with Saks, Shin received a base salary of multiple hundreds of thousands of dollars. Shin also received multiple six-figures worth of performance-based bonuses in the year prior to her resignation. In connection with her employment and her professional advancement with BG, NMG offered Shin the opportunity to participate in a series of equity participation plans. NMG offered such opportunities to only a small group of high-level employees.

32.    As a condition of participating in these plans, Shin repeatedly agreed to abide by post-employment restrictive covenants designed to protect Saks' confidential business information, goodwill, and relationships with its brands, customers, and vendors.

33.    On January 7, 2022, Shin signed The Neiman Marcus Group LLC Long-Term Cash Incentive Plan Award Notice (the "LTIP Agreement"), attached hereto as Exhibit A. As a condition of this award, Shin executed the Restrictive Covenant Agreement (the "RCA"), also on January 7, 2022, and attached hereto as Exhibit B.

34.    In her RCA, Shin agreed to certain restrictive covenant obligations.

35.    Because of the extent, depth and breadth of Shin's knowledge of NMG's confidential business information and its strategies for competing with its key competitors, Shin's covenants included her agreement to refrain from performing duties for a competitor that are the same or similar to those Shin performed was her last 12 months of employment with NMG. Shin agreed to refrain from such "Prohibited Activity" for a period one year following her separation of employment. *Id*. § 2(a).

36.    The RCA defines such "Prohibited Activity" as activities where:

> Employee contributes the Employee's knowledge, directly or indirectly…to an entity engaged in the same or similar business as the Employer, including those engaged in

the business of retail within the Restricted Territory. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets, proprietary information, or Confidential Information.

*Id.* The RCA defines "Restricted Territory" as any (i) the United States; (ii) any foreign country where NMG or its affiliates "engage[] in business of any kind" and where Shin engaged in business on behalf of NMG in the 24 months preceding her separation from NMG; and (iii) any U.S. city where Shinengaged in business on behalf of NMG or its affiliates in the 24 months preceding her separation from NMG. *Id.* § 1(a).

37.     Shin also agreed not perform duties for competitors "engaged in the same or similar business as [NMG] including, but not limited to (i) the retail operations of any entity that, … was a vendor of the [NMG] or any of its Affiliates and that…had annual gross sales to the Employer and its Affiliates in the aggregate of $150 or more at retail;" or (ii) any entity…that owns or operates a luxury apparel and accessories department store, specialty retail store or online store." *Id.* § 2(a).

38.     Finally, Section 2(a) of the RCA expressly prohibited Shin from being employed by Nordstrom for a period of 12 months after her separation of employment:

> … (i) any Person (other than the Company or its Affiliates) that owns or operates a multi-brand luxury apparel and accessories (A) department store, (B) specialty retail store, or (C) online store or operating system application (commonly referred to as an "app"); (ii) Saks Incorporated, **Nordstrom, Inc.**, Barneys New York, Inc., Macy's, Inc., Bloomingdale's Inc., Hudson's Bay Company, Amazon.com, Inc. (including Amazon.com, Inc.'s Luxury Stores), Lord & Taylor Holdings, LLC, Yoox Net-a-Porter Group S.p.A, Matches Fashion, Luisa Via Roma, S.p.A, Farfetch, MyTheresa, , Revolve, Stylebop GmbH, and Moda Operandi, Inc., or, if those corporate names are not correct, the businesses commonly referred to as "Saks," **"Nordstrom's**," "Macy's," "Bloomingdales," "Hudson's Bay," "Amazon," "Luxury Stores," "Net-a-Porter," "Matches Fashion," "Luisa Via Roma," "Farfetch," "MyTheresa," "Revolve," "Stylebop," and "Moda Operandi," or any of their respective parent companies, as applicable; (iii) the divisions, entities, or other segments of any Person that conduct business under or as the following luxury brands: CHANEL, Louis Vuitton, Christian Louboutin, Saint Laurent, Moncler, Brunello Cucinelli, Gucci, Van Cleef & Arpels, TOM FORD, and Valentino; and (iv) the successors to and assigns of the Persons described in clauses (ii) or (iii). For the avoidance of doubt, the term Competitor shall not include luxury brands (other than the luxury brands listed in the preceding sentence) whether or not such brands operate retail stores that distribute exclusively their own brands.

*Id.* (emphasis added). Shin further promised to safeguard the confidentiality of NMG's trade secrets and confidential business information. *Id.* § 1(a).

39.    Shin also agreed to (i) "treat all Confidential Information as strictly confidential;" (ii) "not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever…not having a need to know and authority to know and use the Confidential Information in connection with the business" of NMG; (iii) not to directly or indirectly disclose, "to anyone outside of the direct employ of the [NMG] except as required in the performance of the Employee's authorized employment duties to [NMG]; and (iv) "not to access or use any Confidential Information, … not to copy any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of [NMG]." *Id.*

40.    On July 23, 2023, Shin signed the NMG Parent LLC Amended and Restated Performance-Based Phantom Unit Agreement (the "Phantom Award Agreement"), attached hereto as Exhibit C.[1] The Phantom Award Agreement granted Shin a certain quantity of "Phantom Units" pursuant to the NMG Parent LLC 2021 Management Incentive Plan (the "MIP"), attached hereto as Exhibit D.

41.    As a condition of receipt of the Phantom Units, Shin again agreed to abide by restrictive covenants, including a non-competition provision and confidentiality obligation. The Phantom Award Agreement contains these confidentiality and non-competition provisions at Sections 11(a) and 11(d), respectively. Exh. C, §§11(a), 11(d).

---

[1] Prior to the Phantom Agreement, Defendant signed a prior Performance-Based Phantom Unit Agreement on October 11, 2021. Exh. C, Preamble. The Phantom Agreement "amends, restates, and supersedes" the agreement signed on October 11, 2021. *Id.*

42.    The Phantom Award Agreement's non-competition provision prohibits Shin, for a period of year following her separation from BG:

> § 11(d)(iii) [T]he Participant shall not directly or indirectly, as an employee, officer, director, agent, partner, stockholder, owner, member, representative, consultant, or otherwise, associate with, or provide services to any Competitor or any of its Affiliates.

43.    The Phantom Award Agreement does not define the term "Competitor." However, it provides that "[c]apitalized terms used herein without definition have the meanings ascribed to such terms in the [MIP]." Exh. C, Preamble.

44.    The MIP defines a Competitor as:

> … (i) any Person (other than the Company or its Affiliates) that owns or operates a multi-brand luxury apparel and accessories (A) department store, (B) specialty retail store, or (C) online store or operating system application (commonly referred to as an "app"); (ii) Saks Incorporated, **Nordstrom, Inc.**, Barneys New York, Inc., Macy's, Inc., Bloomingdale's Inc., Hudson's Bay Company, Amazon.com, Inc. (including Amazon.com, Inc.'s Luxury Stores), Lord & Taylor Holdings, LLC, Yoox Net-a-Porter Group S.p.A, Matches Fashion, Luisa Via Roma, S.p.A, Farfetch, MyTheresa, , Revolve, Stylebop GmbH, and Moda Operandi, Inc., or, if those corporate names are not correct, the businesses commonly referred to as "Saks," **"Nordstrom's**," "Macy's," "Bloomingdales," "Hudson's Bay," "Amazon," "Luxury Stores," "Net-a-Porter," "Matches Fashion," "Luisa Via Roma," "Farfetch," "MyTheresa," "Revolve," "Stylebop," and "Moda Operandi," or any of their respective parent companies, as applicable; (iii) the divisions, entities, or other segments of any Person that conduct business under or as the following luxury brands: CHANEL, Louis Vuitton, Christian Louboutin, Saint Laurent, Moncler, Brunello Cucinelli, Gucci, Van Cleef & Arpels, TOM FORD, and Valentino; and (iv) the successors to and assigns of the Persons described in clauses (ii) or (iii). For the avoidance of doubt, the term Competitor shall not include luxury brands (other than the luxury brands listed in the preceding sentence) whether or not such brands operate retail stores that distribute exclusively their own brands.

Exh. D, § 2.1 (emphasis added). Thus, the non-competition provision contained within the Phantom Award Agreement prohibits Shin from commencing employment with Nordstrom within one year of her separation from NMG. This language mirrors the definition of "Competitor" contained in the RCA.

45.    Most recently, Shin received grants and executed the Fiscal Year 2023 Equity Tracking Unit Agreement (the "FY 2023 ETU Agreement"), attached hereto as Exhibit E and the Fiscal Year

2024 Equity Tracking Unit Agreement (the "FY 2024 ETU Agreement"), attached hereto as Exhibit F, both pursuant to The Neiman Marcus Group Equity Appreciation Plan.

46.    Both the FY 2023 and FY 2024 ETU Agreements conditioned the equity grants upon Shin's acceptance of, and compliance with, the RCA's post-employment non-disclosure and non-competition obligations. *See* Exhs. E and F, § 2(h)(iv).

47.    Shin executed the FY 2024 ETU Agreement on January 4, 2024, and it is Shin's most recent affirmation of her post-employment obligations to NMG.

48.    The restrictions to which Defendant agreed are reasonable and necessary to protect Plaintiffs' legitimate interests, including the protection of its: (a) trade secrets; (b) valuable confidential business information that otherwise does not qualify as trade secrets; (c) substantial relationships with Saks' customers, business partners, and/or employees; and (d) goodwill.

49.    Plaintiffs fulfilled their obligations under the LTIP Agreement, Phantom Award Agreement, FY 2023 ETU Agreement, and FY 2024 ETU Agreement by making equity grants to Defendant in accordance with the terms of each agreement.

### *Shin Resigns to Take a Role with Nordstrom, One of Saks' Largest Competitors*

50.    Upon information and belief, Shin received an offer of employment from Nordstrom no later than September 14, 2025.

51.    On October 14, 2025, Defendant resigned from her position as CMO of BG.

52.    When Shin tendered her resignation to Tracy Margolies, President of BG, Shin disclosed that she accepted a position at Nordstrom. Shortly thereafter, Saks learned that Shin intended to begin her employment with Nordstrom prior to the end of the one-year restricted period contained in the non-competition provisions of her RCA and the Phantom Award Agreement.

53.    On October 15, 2025, and again on October 17, 2025, Saks wrote to Shin to advise her that her intended employment with Nordstrom would violate her post-employment non-competition

obligations to Saks. In its letters, Saks requested assurances that Shin would adhere to her obligations under the RCA and Phantom Award Agreement.

54.    Shin has made no such assurances, but rather, has confirmed her intent to imminently commence employment with Nordstrom.

55.    The RCA expressly identifies Nordstrom as one of the companies that is a Competitor to NMG. Exh. B, § 2(a). Likewise, pursuant to the Phantom Agreement, and as defined in the MIP, Nordstrom is a specifically identified Competitor. Exh. D, § 2.1.

56.    Both the RCA and the Phantom Award Agreement prohibit Shin from working for a Competitor for a one-year restricted period. Exh. B, § 2(a); Exh. C, § 11(d)(iii)

57.    Shin has advised Saks that she intends to begin her role with Nordstrom within the restricted period defined in her restrictive covenants. Upon information and belief, she intends to take this position within the Restricted Territory.

58.    Shin's prospective employment with Nordstrom constitutes a violation of the non-compete restrictions in the RCA and the Phantom Award Agreement, which strictly prohibit her from working for Nordstrom.

### _Defendant Engages In Suspicious and Concerning Conduct,_ _Including Destroying Data On Her Company-Issued Cellular Device and iPad and Downloading_ _Highly Sensitive Confidential Information_

59.    Saks issued Shin two Hewlett Packard laptops, an iPhone, and an iPad (collectively, the "Devices") to use in connection with her employment at BG.

60.    After advising Saks of her resignation, Shin returned these company-issued Devices on or around October 14, 2025 to Saks. Shin did not deliver to Saks any other devices, USB drives, or other external media that she may have acquired independently, nor did she advise that she had connected any such devices, USB drives, or external media to her Saks-issued laptops.

61.    Upon receiving the Devices, Saks noticed several irregularities and conducted a preliminary investigation into Shin's use of the Devices.

62.    As a result of this investigation, Saks found evidence indicating that on October 9, 2025—merely days before resigning—Shin downloaded over 80 confidential and proprietary Saks documents.

63.    These documents were highly confidential, and Shin had no legitimate, job-related reason to download the documents mere days before her resignation. For example, Shin accessed, downloaded, and/or otherwise copied: (i) full, seven-year view of the financial and sales performances for Bergdorf's Top 200 brands. This information is highly confidential and is only shared with Saks' top executives. This performance data is not even shared with brand partners; (ii) at least 15 comprehensive, five-year overviews of Saks's business and financial relationships (across all Saks' business units) with its top and most critical brand partners—essentially "open books" on the brand; and (iii) financial "roll ups" for at least 30 brands, which provide detailed information on cross-marketing and merchandising strategies, financial performance and gross margins, from which profitability by channel can be determined for each brand, and highly confidential, heavily-negotiated terms between Saks and the brand partners.

64.    Again, as CMO of BG, Shin had no legitimate business reason to access, let alone download or copy, detailed and highly confidential documents relating to non-BG businesses within Saks shortly before her resignation, but for an apparent intent to use such information to compete with Saks upon commencing her employment at Nordstrom.

65.    Simply reviewing these documents would provide Shin with a significant amount of information to use on behalf of a competitor like Nordstrom, to the detriment of Saks and BG, exponentially magnifying the immediate and irreparable harm to Saks. By possessing these documents,

a competitor would know which brands to target based on performance and profitability—an immediate unfair advantage to other retailers in the luxury brand market.

66.    When Saks reached out to Shin regarding her efforts to access and/or download these documents, Shin did not deny downloading or accessing these documents.

67.    After identifying this concerning activity, Saks engaged a computer forensic vendor to conduct a third-party forensic analysis of the devices. While this investigation is ongoing, the vendor has identified several instances of concerning and suspicious conduct:

(a)    The vendor confirmed that Shin's Saks-issued iPhone and iPad were reset, effectively deleting all data on those devices; upon information and belief, Shin intentionally and knowingly performed a factory reset on the iPhone prior to turning it in, deleting all data on the phone, which may include evidence related to this matter.

(b)    Shin downloaded significant amounts of proprietary information from Saks' servers in quick succession, and upon information and belief, Shin also took actions to convert certain files into PDFs for the purpose of permanently retaining them.

(c)    In September 2025, Shin attached an external hard drive to her Saks work laptops with a storage capacity of 2 TB, which could be large enough to copy the entire contents of Shin's two Saks-issued computers. Upon information and belief, Shin did this only days after receiving an offer of employment from Nordstrom. Shin's internet browsing history on one of her Saks-issued computers indicates Shin investigated how to set up or use the hard drive at this time. Shin did not return a hard drive to Saks when she resigned.

(d)    In September and October 2025, Shin regularly accessed her personal email and personal Google Drive from the Saks-issued laptops. Ms. Shin accessed a folder in her personal Google Drive titled "Bergdorf Goodman" and she had a "Bergdorf" label in her personal Gmail.

(e)    Upon information and belief, Shin's activities on her personal Google Drive and Gmail throughout September and October 2025 indicate sustained activity that could include moving or copying files.

(f)    Shin interacted with over 243 files and folders on Saks' Google Drive infrastructure between October 8, 2025 and her resignation four business days later on October 14, 2025.

(g)    Shin downloaded at least 82 files of confidential Saks information between October 8, 2025 and October 14, 2025.

68.     Upon information and belief, Shin's destruction of information and efforts to retain Saks' confidential information were deliberate, willful, knowing, and performed without authorization or permission from Saks.

### The Threat Of Irreparable And Immediate Harm
### Saks Faces From Shin's Conduct

69.     Shin's course of conduct violates the non-compete and confidentiality covenants that she entered into with Saks in exchange for lucrative equity participation opportunities, including but not limited to her express covenant promising not to provide services to or be employed by Nordstrom for a period of one year following her separation from Saks.

70.     Shin repeatedly agreed, through multiple agreements, that if she breached her ongoing obligation not to compete with Saks, she would cause irreparable harm to Saks.

71.     Shin's intent to imminently commence employment with Nordstrom threatens Saks with immediate irreparable harm, including, but not limited to:

a.  **Loss of Trade Secrets and Strategic Advantage:** Shin cannot perform a similar role at Nordstrom without inevitably using or disclosing Saks' confidential information and trade secrets, including the information listed in paragraph 21(a)-(f) above. This would effectively transfer the benefit of Saks' substantial investment in developing, for example, its inventory operations models and highly confidential data related to brand partner performance.

b.  **Compromised Brand Relationships:** As BG's former CMO, Shin could leverage her personal relationships with Saks' brand partners, which were developed at Saks' expense and with Saks' insights, to secure similar or more favorable arrangements for Nordstrom, potentially diminishing or eliminating the exclusive arrangements that differentiate our offerings in the market.

c.  **Customer Relationship Harm:** Shin's knowledge of Saks' customer strategies and data would allow her to target Saks' most valuable customers using knowledge and insights (*see* ¶¶ 22-26) developed at Saks' expense for the benefit of Nordstrom.

d.  **Financial Impact:** The CMO possesses detailed knowledge of Saks' financial models, cost structures, and profit margins. This information would enable Nordstrom to undercut Saks' promotional strategies in key product categories where margins are highest, causing immediate financial damage.

e. **Strategic Planning Advantage:** With knowledge of Saks' long-term strategic plans, including new initiatives, expansions, and focus areas for the upcoming fiscal years, Nordstrom could preemptively enter markets or secure relationships that Saks has identified as strategic priorities.

72.    If Shin's conduct is not enjoined immediately, Saks will suffer irreparable harm that cannot be compensated by money damages, because: (i) the loss of exclusive brand relationships would fundamentally alter BG's market position in ways that cannot be quantified; (ii) the disclosure of Saks' trade secrets and confidential inventory and financial terms and models with brand partners would permanently destroy their value; and (iii) the advantage granted to Nordstrom would alter the competitive landscape in ways that would be impossible to precisely measure or remedy after the fact.

73.    The issuance of injunctive relief is necessary to protect Saks' legitimate business interests and to preserve the integrity of restrictive covenant agreements entered into with employees such as Shin, whereas denial of injunctive relief will leave Saks vulnerable to the same or similar conduct from other employees.

### *Shin's Equity Repayment Obligation*

74.    In executing the FY 2023 and 2024 ETU Agreements, Shin agreed that if she competed against Saks, or disclosed Saks' confidential information, she would immediately forfeit the value of all vested and unvested equity granted under these agreements. Exhs. E and F, § 2(c)(ii).

75.     The FY 2023 and FY 2024 ETU Agreements also require Shin to promptly repay to Saks any amounts previously received under these agreements. *Id*.

76.    Pursuant to Shin's FY 2023 and FY 2024 ETU Agreements, Shin has received payouts valued at $48,184.65.

77.    As authorized under Section 2(c)(ii) of the ETU Agreements, Saks sent Shin a written demand on October 23, 2025 for repayment to Shin due to her violation of her contractual obligations. To date, Shin has not repaid the sums due under the FY 2023 and 2024 ETU Agreements.

## COUNT I
## BREACH OF CONTRACT – RESTRICTIVE COVENANTS

78.     The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

79.     By virtue of Shin accepting a position with a competitor in violation of her non-competition obligations noted above, Shin has breached—or absent injunctive restraints imminently will breach—the terms of the restrictive covenants she agreed to in multiple contracts with Saks, attached as Exhs. A-F.

80.     Upon information and belief, and as Saks expects to establish upon further investigation and discovery, absent judicial intervention in the form of an injunction, Shin will be in violation of, and will continue to violate, her contractual obligations.

81.     As a consequence of the foregoing, Saks faces irreparable harm and damages in an amount that is presently unascertainable, and of a nature that are incalculable, which absent injunctive relief will be ongoing and continue unabated.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE
## DEFEND TRADE SECRETS ACT

82.     The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

83.     Saks possesses certain trade secrets and confidential information with which Shin is deeply familiar, and which she has a duty not to disclose or use, including on behalf of a competitor such as Nordstrom.

84.     The above-described documents and information are trade secrets of Saks subject to protection under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq*.

85.    The information as described above derives independent economic value, actual and potential, from not being generally known, and specifically from not being known to competitors of Nordstrom who could profit from its use or disclosure.

86.    Nor is the above-described information readily ascertainable by Saks' competitors or other persons by proper means.

87.    Saks' trade secrets provide it with an advantage over its competitors.

88.    Saks has expended significant resources in developing its trade secrets for its exclusive benefit.

89.    Saks has taken reasonable steps to protect its trade secrets from disclosure, including by requiring high level and experienced executives such as Shin to abide by the terms of the agreements described herein, as well as by implementing data security measures, including limiting access to sensitive information to those with a business need, information security policies that include data access procedures to limit access to confidential business information, and monitoring for unauthorized activity.

90.    Shin's conduct, as described above, constitutes a misappropriation of Saks' trade secret information in violation of the DTSA.

91.    Upon information and belief, and as Saks expects to establish on further investigation during discovery, Shin improperly retained the trade secrets contained in files and documents that Shin had access to prior to her resignation, when she knew she would be resigning from employment with Saks and imminently working for its direct competitor, Nordstrom.

92.    As a direct and proximate result of Shin's misappropriation, Saks has suffered and continues to suffer damages and irreparable harm, and is entitled to all damages, attorneys' fees, costs, and remedies permitted under the DTSA.

93.     The acts of misappropriation were done maliciously by Shin, hereby entitling Saks to exemplary damages to be proven at trial.

94.     Shin's misappropriation was willful and malicious, thereby entitling Saks to an award of attorneys' fees under the DTSA.

**COUNT III**
**COMMON LAW MISAPPROPRIATION**
**OF TRADE SECRETS UNDER NEW YORK LAW**

95.     The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

96.     Saks owns confidential and proprietary information constituting trade secrets under New York law, including brand financial data, enterprise-wide business strategies, customer lists, and merchandising strategies, among other things, as detailed above. These trade secrets derive independent economic value from not being generally known and are subject to reasonable security measures, including confidentiality agreements, restricted access protocols, and encryption technologies.

97.     Shin had authorized access to Saks' trade secrets during employment but has misappropriated them by, upon information and belief, mass downloading of data and other documents , attempting to utilize a personal external hard drive, and upon information and belief, undertaking efforts to access, download, and/or copy such documents for further use.

98.     Upon information and belief, Shin has used, or intends to use, Saks' trade secrets without authorization in connection with her new employment at Nordstrom, a direct competitor of Saks, despite her with knowledge that such information was acquired under circumstances giving rise to a duty to maintain secrecy.

99.     Disclosure of Saks' trade secrets is inevitable because Shin has accepted a position at Nordstrom, a direct competitor that would necessarily require reliance on knowledge of (i) Saks' trade

secrets; and (ii) proprietary information and trade relationships developed at Saks' expense, in a highly competitive market, and Shin cannot reasonably compartmentalize and selectively forget such information while performing identical job functions.

100.    Shin's actual and threatened misappropriation was willful and malicious, as evidenced by deliberate efforts to take or access such information prior to resignation and subsequent employment with a chief competitor.

101.    As a consequence of the foregoing, Saks faces irreparable harm and damages in an amount that is presently unascertainable, and of a nature that are incalculable, which absent injunctive relief will be ongoing and continue unabated.

**COUNT IV**
**BREACH OF DUTY OF LOYALTY**

102.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

103.    As an employee of Plaintiffs, Shin owed Saks a duty of loyalty, which included the obligation to act in good faith and in the best interests of Saks during Shin's employment.

104.    Shin breached this duty of loyalty by: (i) misappropriating Saks' confidential information and trade secrets; (ii) taking steps to compete with Saks while still employed by Saks; and (iii) otherwise engaging in conduct adverse to Saks' interests.

105.    Upon information and belief, Shin began preparing to compete with Saks while still employed by Saks by downloading confidential information and trade secrets for use in Shin's new employment with a competitor.

106.    Shin's breach of the duty of loyalty has directly and proximately caused Saks to suffer damages in an amount to be determined at trial.

## COUNT V
## BREACH OF CONTRACT - EQUITY CLAWBACK

107.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

108.    The FY 2023 and FY 2024 ETU Agreements contain provisions requiring the forfeiture of vested and unvested equity units grants in the event Shin breaches their restrictive covenants, including the covenant not to compete and non-disclosure agreements. Shin has breached these agreements, triggering the forfeiture of vested and unvested equity units.

109.    Upon information and belief, Shin has breached this contractual obligation as she does not intend to pay the $48,184.65 that she owes to Saks pursuant to the FY 2023 and FY 2024 ETU Agreements.

## COUNT VI
## UNJUST ENRICHMENT

110.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

111.    Upon information and belief, Shin does not intend to make payment of the $48,184.65 she owes pursuant to the FY 2023 and FY 2024 ETU Agreements.

112.    By violating her contractual obligations and refusing to pay Saks, Shin has unlawfully exercised dominion and control over $48,184.65.

113.    As a result of Shin's actions, Saks has suffered and will continue to suffer financial injury and harm to its detriment, and to the benefit and gain of Shin, in the amount of $48,184.65.

## COUNT VII
## CONVERSION

114.    The allegations of the preceding paragraphs are incorporated herein by reference with the same force and effect as if set forth in full below.

115.    Upon information and belief, Shin does not intend to make payment of the $48,184.65 she owes pursuant to the FY 2023 and FY 2024 ETU Agreements.

116.    By violating her contractual obligations and refusing to pay Saks, Shin has unlawfully exercised dominion and control over $48,184.65.

117.    As a result of Shin's conversion, Saks has suffered damages.

### PRAYER FOR RELIEF

**WHEREFORE**, by virtue of the foregoing acts and conduct complained of above, Plaintiffs demand the following relief:

1.      Temporary, preliminary and permanent injunctive relief against Shin for a period of twelve (12) months from the date of Shin's separation of employment with Saks prohibiting Shin from, directly or indirectly, and whether alone or in concert with others, doing any of the following:

(a)      Providing any services to, or for, Nordstrom, or any other business or entity that is engaged in a business similar to, or that competes with, the business of Saks, including specifically that Shin shall not accept the position currently offered by Nordstrom;

(b)      Providing services to, or for, Nordstrom, or any other business or entity that competes with the business of Saks, that will likely result in the disclosure of Saks' confidential information to such business or use Saks' confidential information on behalf of such business, including specifically that Shin shall not accept the offered position with Nordstrom;

(c)      Enjoin Shin from destroying, erasing or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or information maintained in computer files or other electronic storage media) in Shin's possession or control which were obtained from, or contain information derived from, any Saks records, which pertain to Saks' business units, brands, vendors, or customers, or which relate to any of the events alleged in the Complaint in this action;

2.       Compensatory damages in an amount to be proven at trial;

3.       An award of exemplary damages as permitted by law;

4.       Costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

5.       Such other and further relief as the Court may deem equitable and just.

<strong>DEMAND FOR JURY TRIAL</strong>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury as to all issues so triable.


Dated: November 25, 2025               Respectfully submitted,

FISHER & PHILLIPS LLP


*/s/ Amanda E. Brown*
Amanda E. Brown
Texas Bar No.: 24087839
**FISHER & PHILLIPS LLP**
500 Crescent Court, Suite 300
Dallas, TX 75201
Telephone: (214)220-9100
Facsimile: (214)220-9122
Email: amebrown@fisherphillips.com


Attorney for Plaintiffs
Saks Global Enterprises LLC and
The Neiman Marcus Group LLC